UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| GENARO GARCIA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:23-cv-00255-JPH-MKK |
| | ) |
| ASHLEY PARIDO, | ) |
| KEVIN HUNTER, | ) |
| SAMUEL BYRD, | ) |
| BARBARA RIGGS, | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DIRECTING ENTRY OF FINAL JUDGMENT**

Plaintiff Genaro Garcia brought this civil action against four defendants: Indiana Department of Correction ("IDOC") employees Ashley Parido and Kevin Hunter ("IDOC Defendants"), and medical employees Dr. Samuel Byrd and RN Barbara Riggs ("Medical Defendants"). He alleges that they were deliberately indifferent to his serious medical needs by compelling him to move to a second-floor cell despite his known injuries and mobility issues. Defendants have moved for summary judgment. Dkts. [72], [75]. Additionally, Defendants have moved to strike Mr. Garcia's surreply, dkts. [92], [94], and Mr. Garcia has moved for relief from the Court's discovery Order at docket 108. Dkt. [111].

I. **Motion for Relief from Order**

Mr. Garcia seeks relief under Federal Rule of Civil Procedure 60(b) from the Court's Order at Docket 108, which denied his motion to submit additional evidence in support of his summary judgment response. Dkt. 111. Since the

1

Court has not entered final judgment, Rule 60(b) does not apply. *See Waetzig v. Halliburton Energy Services, Inc.*, 145 S. Ct. 690, 696 (2025). The Court therefore construes Mr. Garcia's filing as a motion for reconsideration under Rule 54(b), which provides that pre-judgment orders "may be revised at any time before the entry of judgment." Under Rule 54(b), "the district court has the discretionary authority to reconsider" a pre-judgment order. *Galvan v. Norberg*, 678 F.3d 581, 587 (7th Cir. 2012).[1]

In his original motion, Mr. Garcia sought to submit results from a September 5, 2024, MRI to "support Plaintiff's continue[d] argument of medical condition and sever[e] pain." Dkt. 100. The Court denied his motion because discovery and "[b]riefing on the pending summary judgment motions has been closed for some time, and Plaintiff has not explained why he could not have submitted the evidence at issue earlier." Dkt. 108 at 1.

Regardless of whether Mr. Garcia could have submitted the MRI results sooner, he has not shown how MRI results from September 2024 could be relevant to any allegations of deliberate indifference from 2022. *See O'Brien v. Ind. Dept. of Corr.*, 495 F.3d 505, 509 (7th Cir. 2007) (Deliberate indifference "must logically depend on what information was available to the defendant at the time that a decision was made."). Mr. Garcia's motion for reconsideration is therefore **denied**. Dkt. [111].

---

[1] Since a magistrate judge issued the order at docket 108, Mr. Garcia could have objected under Federal Rule of Civil Procedure 72(a), which requires the district judge to "set aside any part of the order that is clearly erroneous or contrary to law." But Mr. Garcia did not indicate that he wanted to object to the magistrate judge's decision and Rule 54(b) affords ample discretion to modify the order if necessary.

2

## II.     Motions to Strike Surreplies

Mr. Garcia filed surreplies in response to the IDOC Defendants' reply and the Medical Defendants' reply. Dkt. 90; dkt. 93. Defendants have moved to strike those surreplies. Those motions, dkt. [92]; dkt. [94], are **granted**. "A party opposing a summary judgment motion may file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response." S.D. Ind. L.R. 56-1(d). Defendants' replies appropriately responded to Mr. Garcia's summary-judgment briefs without relying on new evidence or raising new arguments. Dkt. 87; dkt. 89. Indeed, Mr. Garcia admits that in his surreplies. Dkt. 90 at 1 ("The state-defendant motion is rep[etitive] and is with no new evidence or argument."); dkt. 93 at 1 ("The medical-defendants' motion is rep[etitive] and bas[e]less. It is with[out] [ ] new evidence or argument."). The surreplies therefore are not permitted under this Court's Local Rules. S.D. Ind. L.R. 56-1(d); *GEFT Outdoor, L.L.C. v. City of Westfield*, 491 F.Supp.3d 387, 396 (S.D. Ind. 2020) ("Courts allow a surreply brief only in limited circumstances to address new arguments or evidence raised in the reply brief or objections to the admissibility of the evidence cited in the response.") (citations omitted); *see also McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 787 (7th Cir. 2019) ("district judges may strictly enforce local summary-judgment rules"). "Strict enforcement" may also apply to pro se litigants. *See McCurry*, 942 F.3d at 787 n.2.

The **clerk is directed** to **strike** Mr. Garcia's surreplies, dkts. [90], [93].

3

### III. Motions for Summary Judgment

**A. Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered

4

undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## B. Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Garcia and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### 1. The Parties

At all relevant times, Mr. Garcia was an IDOC inmate housed at Wabash Valley Correctional Facility ("WVCF"). Dkt. 72-1 at 11.

Ashley Parido was employed by the IDOC as a Caseworker and assigned to the L-Housing Unit ("LHU") at WVCF. Dkt. 72-1 at 12. She was Mr. Garcia's assigned Caseworker when he was housed in the LHU. *Id.* Kevin Hunter was employed by the IDOC as the Unit Team Manager of the E-Housing Unit ("EHU"). Dkt. 72-11 at ¶ 2.

Dr. Samuel Byrd is a licensed physician and was providing healthcare services at WVCF. Dkt. 34 at 1. RN Barbara Riggs is a registered nurse and was the Director of Nursing at WVCF. *Id.*

### 2. Mr. Garcia's Housing History

While incarcerated at WVCF, Mr. Garcia has primarily been housed in either the LHU or EHU. Dkt. 72-8 at 2. The EHU is located on the north side of WVCF, and inmates housed there are served their meals in house; inmates in other housing units, including the LHU, must walk to the dining hall unless

5

they have a medical pass. Dkt. 72-11 at ¶ 7; dkt. 72-1 at 16, 21-22, 61. Assigned cells within housing units are given a number and either a "U" or "L" which designates whether the inmate is assigned to an upper or lower bunk. Dkt. 72-1 at 20.

Beginning in December 2020, Mr. Garcia was in the LHU in cell 322-L. *Id.*; dkt. 72-8 at 2. He was transferred in May 2021 to the EHU, cell 121-L. Dkt. 72-8 at 2. He was briefly moved to a different unit in July 2022 pending an investigation before being returned to cell 121-L in the EHU. *Id.* On September 12, 2022, Mr. Garcia was moved to the LHU again, to cell 323-L. *Id.* This move was for safety reasons because he was stabbed by another inmate in the EHU. Dkt. 72-1 at 24.

### 3. Mr. Garcia's Medical History

In 1999, Mr. Garcia was injured in a car accident where he flew through the windshield. Dkt. 72-1 at 16. Since then, he required medical care for left leg pain management, ongoing neuropathy, atrophy of his left leg muscles, lumbar radiculopathy, chronic back pain, and left ankle instability. Dkt. 72-4 at 19, 68; dkt. 72-7. This resulted in mobility issues because Mr. Garcia's leg would become numb and his ankle would twist to the side. Dkt. 72-1 at 16, 31. These injuries began to worsen in 2017, and by March 2021 limited his ability to walk long distances. *Id.* at 16; dkt. 72-3 at 16, 24.

In March 2021, Mr. Garcia had a medical lay-in pass—which included not having to walk to the dining hall—that was set to expire. Dkt. 72-1 at 16; dkt. 72-3 at 16, 24. Non-parties Dr. Rajoli and Nurse Hobson decided to

6

recommend his placement in the EHU instead, as he would receive meals in house. Dkt. 72-3 at 18. Dr. Rajoli noted that Mr. Garcia had seen specialists "at least 4 times over the course of the last 3 years" but that the braces they provided "have not helped him ambulate long distances." *Id.* While that housing unit transfer was pending, Mr. Garcia renewed his medical lay-in pass. *Id.* at 20, 36-37, 78, 80. He was transferred to the EHU in May 2021, dkt. 72-8 at 2, and his medical lay-in pass expired, dkts. 72-3 at 80; dkt. 72-4.

Also in May 2021, Dr. Rajoli and multiple nurses saw Mr. Garcia for heartburn. Dkt. 72-3 at 39-49. The next month, he was involved in an altercation where another inmate attacked him, hitting his face. *Id.* at 58-61. Dr. Byrd ordered x-rays and asked to see him after those results arrived. *Id.* at 57, 61. After a follow-up with a nurse, Dr. Byrd ordered additional x-rays. *Id.* at 62, 67. In October 2021, Mr. Garcia saw Dr. Byrd for a chronic care visit. *Id.* at 70. They discussed Mr. Garcia's chronic pain and Dr. Byrd noted Mr. Garcia's comments that "given he is on North Side of camp and doesn't have to ambulate long distances, his pain is manageable" with his current treatment and "simply wants to ensure this is renewed." *Id.*

Mr. Garcia did not see Dr. Byrd again for another year. Dkt. 72-4 at 19-22. In October 2022, they discussed his continued chronic pain and his experiences with various pain medications in the past. *Id.* Dr. Byrd ordered a higher dose of Mr. Garcia's current pain medication and noted that they may try another option in the future if the higher dose proved to be ineffective. *Id.* at

7

19, 22. Mr. Garcia told Dr. Byrd that "not walking to chow [was] beneficial in that he struggled to get back to cell house in time due to gait issue." *Id.* at 19.

### 4. Mr. Garcia's Fall

On November 29, 2022, Mr. Garcia had been back in the LHU about two and a half months, after being transferred because he'd been stabbed while in the EHU. Dkt. 72-8 at 2; dkt. 72-1 at 24. Ms. Parido went to Mr. Garcia's cell in the LHU and told him he needed to walk to the dining hall to eat. Dkt. 72-1 at 15. He responded that he had a medical lay-in pass and asked her to confirm it with Dr. Byrd. *Id.* at 15, 17. She emailed Dr. Byrd the next morning, stating there was no paperwork indicating Mr. Garcia had such a pass. Dkt. 72-7. Dr. Byrd responded shortly after, summarizing Mr. Garcia's medical issues that would affect his mobility and stating "[h]e should be medical idle as far as a job goes, but he would not have a medical lay in. I think we have asked he be housed on north side of camp to avoid trips to chow for him. He is able to get around housing unit OK. I think he struggles with walk to chow as much as anything." *Id.*

Ms. Parido then tried to find a suitable cell for Mr. Garcia in the EHU. Dkt. 72-10. He had a lower bunk pass at the time, but not a lower range pass, and no inmates he was required to be separated from. Dkt. 72-4 at 27; dkt. 72-1 at 72; dkt. 72-11 at 3. Ms. Parido recommended his transfer to cell 220-L, which is a lower bunk placement on the upper range. Dkts. 72-1 at 29; dkt. 72-10. Non-party Sergeant Earl Brock approved the transfer and Mr. Garcia was moved the next day. Dkt. 72-11 at 2; dkt. 72-8 at 1.

8

Mr. Garcia had submitted a Health Care Request Form ("HCRF") on November 29 asking why he did not have a medical lay-in pass and noting his struggles walking to the chow hall. Dkt. 76-2 at 1. Nurse Riggs responded on December 1, after the transfer to the EHU, that his concern was "addressed." *Id.* He submitted more HCRFs in December 2022 saying that he could not be moved to the EHU, was in severe pain, had an indefinite medical lay-in pass, and should still have a bottom range pass from Dr. Byrd from 2018. *Id.* at 2-8. Mr. Garcia testified that Nurse Riggs told him she sees every request he submits because he has a red flag on his name. Dkt. 72-1 at 67. However, she only responded to his November 29 request. Dkt. 76-2 at 1-8. Other nurses responded to his later requests, noting that he had been seen on December 8 and December 12 and had a chronic care visit scheduled soon. *Id.*

On the morning of December 19, Mr. Garcia had a visit with Nurse Hobson. Dkt. 72-4 at 27-28. He requested a lower range pass due to back, knee, and hip pain he was experiencing after his move to EHU's upper range. *Id.* at 27. Nurse Hobson noted she would consult with the doctor about this request. *Id.*

A few hours later, Mr. Garcia fell down four or five steps in the EHU when his hands slipped while reaching for the stair railing and his leg twisted. Dkt. 72-1 at 34, 39. He saw Nurse Hobson again for treatment after the fall. Dkt. 72-4 at 30-31. She noted he had swelling and bruising, but no redness. *Id.* at 30. She applied heat and a splint, scheduled him for a chronic care visit, and gave a three-day medical lay-in pass. *Id.* at 31. She also noted that the

doctor stated that Mr. Garcia had no medical need for a lower range pass and she educated Mr. Garcia on "how to navigate stairs." *Id.*

Two days later, on December 21, Dr. Byrd saw Mr. Garcia for the chronic care visit. *Id.* at 34. He noted:

> [Mr. Garcia] was moved to upper range last week and predictably fell down the stairs. He has a longstanding [history of] ambulatory difficulty, so I am not sure why one would choose to place him on upper range. One could use the handrail and avoid falling. I think this goes without saying. He has no explanation for as to why he would not approach the stairs in this fashion. Nevertheless, he has some level of fall from the stairs.

*Id.* Mr. Garcia reported "severe, bilateral knee pain," the "[m]ajority" of which "seem[ed] to be from deconditioning and patellofemoral disorder." *Id.* at 34–36. Dr. Byrd noted that "does not appear to have sustained more than some minor injury at best from reported fall." *Id.* Dr. Byrd issued him a lower bunk and lower range pass and a walker, and ordered x-rays of his knee. *Id.* at 32-33, 36. He also noted that Mr. Garcia's counselor, custody staff, and the medical department were notified of the change in his recommended bunk status. *Id.* at 36.

Nurse Riggs did not bring the walker that Dr. Byrd issued, but Mr. Garcia did receive a cane. Dkt. 72-1 at 43. He also moved to the EHU's lower range by walking "cell to cell asking the guys if they would trade me cells." *Id.* at 36. The official transfer order followed on December 27, switching him from cell 220-L to 117-L. Dkt. 72-8 at 1.

10

### C. Discussion

The Eighth Amendment requires states "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

Defendants don't dispute at this stage that Mr. Garcia's medical needs were objectively serious, dkt. 73 at 10; dkt. 77, so the issue at summary judgment is whether a reasonable jury could conclude that the defendants acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Mr. Garcia]'s health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up). Deliberate indifference requires more than negligence or even objective recklessness. *Id.* Rather, Mr. Garcia "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

### 1. IDOC Defendants

Mr. Garcia alleges that Ms. Parido and Mr. Hunter were deliberately indifferent to his serious medical needs by transferring him to an upper range cell despite their knowledge of his mobility issues. Dkt. 18 at 4.

Mr. Garcia has not designated evidence that Mr. Hunter had any involvement with Mr. Garcia's transfer to the EHU's upper range. He cites Mr. Hunter's declaration, but there Mr. Hunter testified that he had "no involvement in the review, determination, or approval of" that bed transfer, and that instead Count Room Sergeant Brock approved it. Dkt. 72-11 at 2. Mr. Garcia's movement history corroborates that by having "BROCK" written as a "movement comment" for the transfer. Dkt. 72-8 at 1. Mr. Hunter is therefore entitled to summary judgment. *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation.").

As for Ms. Parido, the record indicates that she recommended Mr. Garcia's transfer to the EHU based on an email from Dr. Byrd that medical had "asked [that Mr. Garcia] be housed" in the EHU "to avoid trips to chow for him." Dkt. 72-7; dkt. 72-10. She ran a comparison sheet in the IDOC Offender Information System to locate a suitable cell for Mr. Garcia in the EHU. Dkt. 72-10. He had a lower bunk pass at the time, but not a lower range pass. Dkt. 72-4 at 27. Accordingly, Ms. Parido recommended his transfer to cell 220-L, which is a lower bunk placement on the upper range. Dkts. 72-1 at 29, 72-10.

Ms. Parido therefore relied on medical staff's conclusions about Mr. Garcia's limitations. Medical staff had issued him a lower bunk—but not lower range—pass. And Dr. Byrd had just emailed Ms. Parido that Mr. Garcia "is able to get around housing unit OK." Dkt. 72-7. She also found a placement in the EHU, where Mr. Garcia would not have to walk to the dining hall, in accordance with Dr. Byrd's statement that "he struggles with walk[ing] to chow as much as anything." *Id.* Because Ms. Parido was a correctional officer, rather than a medical professional, she was permitted to rely on Dr. Byrd's statement about the reason for Mr. Garcia's medical restrictions. *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022) (noting that in most circumstances, correctional officers may rely on medical providers with respect to medical decisions). The designated evidence therefore does not allow a reasonable jury to conclude that Ms. Parido's actions and reliance on medical staff were deliberately indifferent to Mr. Garcia's serious medical needs. *Dean* 18 F.4th at 241.

Even if this were not true, the IDOC Defendants are entitled to qualified immunity. "[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "To overcome the defendant's invocation of qualified immunity, [Mr. Garcia] must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713 (7th Cir.

13

2013). This "clearly established" standard ensures "that officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Anderson v. Creighton*, 483 U.S. 635, 646 (1987)). A right is clearly established only if "every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015).

Mr. Garcia does not address qualified immunity and points to no law clearly establishing that it would violate his constitutional rights to place him in an upper range cell when medical staff have confirmed that his medical situation allows it and have not issued a pass requiring a lower-range placement. *See* dkt. 82; dkt. 83. That failure means that Mr. Garcia "cannot defeat" the "qualified immunity defense." *Findlay v. Lendermon*, 722 F.3d 895, 900 (7th Cir. 2013) (reversing denial of summary judgment because plaintiff did not meet his burden to show a clearly established violation).

For these reasons, the IDOC Defendants are entitled to summary judgment.

### 2. Medical Defendants

Mr. Garcia alleges that the Medical Defendants were also deliberately indifferent to his serious medical needs by compelling him to move to a second-floor cell. Dkt. 18 at 4. "[M]edical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted). Deliberate

14

indifference may occur when the defendant provides treatment that substantially departs "from accepted professional judgment, practice, or standards"; refuses "to take instructions from a specialist"; persists "in a course of treatment known to be ineffective; chooses "an 'easier and less efficacious treatment' without exercising professional judgment;" or delays treatment with "no penological purpose." *Petties*, 836 F.3d at 729.

For Nurse Riggs, Mr. Garcia has not designated evidence that she was involved in his placement in an upper range cell or in his range-restriction decisions. Mr. Garcia submitted a HCRF to her just before his transfer to the EHU regarding his lack of a medical lay-in pass and his struggles walking to the chow hall. Dkt. 76-2 at 1. She responded that his concerns were "addressed" after he was transferred to the EHU, where he received his meals in house. *Id.*; dkt. 73 at 2-3. There is no other designated evidence that she was involved in Mr. Garcia's care around the time of his transfer. Further, Mr. Garcia testified that IDOC staff, not medical staff, control bed movement. Dkt. 72-1 at 70. He also indicated that doctors, not nurses, decided whether to issue lower-range passes or recommendations. *See id.* at 32–33; *see also* dkt. 72-2 at 12.

Nurse Riggs is therefore entitled to summary judgment. *See Colbert*, 851 F.3d at 657 ("[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation.").

Dr. Byrd discussed Mr. Garcia's mobility issues with him at a chronic care visit in October 2022, including Mr. Garcia's concerns about walking to

the dining hall for meals. Dkt. 72-4 at 19. Mr. Garcia was housed in the LHU at the time. Dkt. 72-8. About a month later, on November 30, Ms. Parido emailed Dr. Byrd regarding Mr. Garcia's mistaken belief that he was on medical lay-in status at the time. Dkt. 72-7. Dr. Byrd responded within minutes, recounting Mr. Garcia's medical conditions and saying that he was "medical idle as far as a job goes, but he would not have a medical lay in." *Id.* He added that he thought the medical department had requested he be "housed on north side of camp to avoid trips to chow" and that he believed Mr. Garcia "struggles with walk to chow as much as anything." *Id.*

On this designated evidence, no reasonable jury could find that Dr. Byrd was deliberately indifferent to Mr. Garcia's medical needs or failed to exercise medical judgment in advising Ms. Parido on his limitations. *Lockett*, 937 F.3d at 1024.

Moreover, Dr. Byrd did not advise where in the EHU he believed Mr. Garcia should be moved, or say that an upper range placement would be appropriate. *See* dkt. 72-7. Instead, Ms. Parido searched for placement options and non-medical IDOC staff approved the move. Dkts. 72-1 at 29; dkt. 72-10; dkt. 72-11 at 2; dkt. 72-8 at 1. And when Dr. Byrd saw Mr. Garcia two days after the fall, Dr. Byrd noted in his medical records that he was "not sure why one would choose to place him on an upper range." Dkt. 72-4 at 34. He issued Mr. Garcia a lower range pass and ordered a walker for him the same day he saw him. *Id.* at 36.

16

No reasonable jury could conclude on this designated evidence that Dr. Byrd "deliberately opted against the best course of treatment" for Mr. Garcia regarding his recommendations for the best cell placement to accommodate Mr. Garcia's mobility issues. *Dean*, 18 F.4th at 241. The lack of a lower-range pass, standing alone, cannot meet Mr. Garcia's burden to designate evidence that Dr. Byrd "*consciously* disregarded a serious risk to his health." *Id.* ("Deliberate indifference requires more than negligence or even objective recklessness."). Instead, examining the totality of the care Dr. Byrd provided with respect to Mr. Garcia's chronic mobility issues, the evidence reflects that he exercised his medical judgment with respect to the orders he issued regarding Mr. Garcia's chronic pain and housing placement needs. *See Wilson v. Adams*, 901 F.3d 816, 821 (2018).

Accordingly, the Medical Defendants are entitled to summary judgment.

### D. Conclusion

Mr. Garcia's motion for reconsideration, dkt. [111], is **denied**. The Defendants' motions to strike Mr. Garcia's surreplies, dkts. [92], [94], are **granted**. The **clerk is directed** to **strike** Mr. Garcia's surreplies, dkts. [90], [93]. The Defendants' motions for summary judgment, dkts. [72], [75], are **granted**.  Final judgment will issue in a separate entry.

**SO ORDERED.**

Date: 3/27/2025

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

GENARO GARCIA
127225
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111
CARLISLE, IN 47838

All Electronically Registered Counsel